IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-78

No. 353A20

Filed 18 June 2021

IN THE MATTER OF:  Z.R., J.R., A.L.M.W.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 13 May 2020 by Judge Tonia Cutchin in District Court, Guilford County.[1]  This matter was calendared for argument in the Supreme Court on 22 April 2021, but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Mercedes O. Chut for petitioner-appellee Guilford County Department of Health & Human Services.*

*Kelsey L. Kingsbery and Michelle C. Prendergast for appellee Guardian ad Litem.*

*Garron T. Michael for respondent-appellant mother.*

PER CURIAM.

---

[1] The trial court's original termination order was filed on 31 March 2020, with an amended order having been filed on 13 May 2020, with the notice of appeal claiming to seek appellate relief from an order filed and served on 2 April 2020.  In view of the fact that no party has objected to the sufficiency of the notice of appeal and the fact that the identity of the relevant termination order is clear from the record, we deem the notice of appeal sufficient to confer jurisdiction upon this Court.

¶ 1     Respondent-mother Tabitha W. appeals from the trial court's order terminating her parental rights in her minor children Z.R., J.R., and A.L.M.W.,[2] who were born in 2013, 2011, and 2008, respectively.[3] *See* N.C.G.S. § 7B-1001(a1) (2019). After careful consideration of the record and briefs in light of the applicable law, we conclude that the trial court's termination order should be affirmed.

¶ 2     On 27 January 2017, the Guilford County Department of Health and Human Services filed petitions alleging that three-year-old Zoey and five-year-old John were neglected and dependent juveniles and obtained the entry of orders placing both of them in nonsecure custody. In its petition, DHHS alleged that respondent-mother, who had had six children, had a child protective services history that dated back to July 2007 and involved multiple reports that she had failed to provide proper care for and supervision of her children and had engaged in substance abuse. In July 2016, DHHS had received another child protective services report alleging that the children's maternal grandmother, who was currently serving as the primary caretaker for five of respondent-mother's children, including Zoey, John, and Allison,

---

[2] Z.R, J.R., and A.L.M.W. will be referred to throughout the remainder of this opinion as "Zoey," "John," and "Allison," which are pseudonyms used for ease of reading and to protect the juveniles' identities. We will refer to respondent-mother's minor child E.A.M. as "Edward," to her minor child Z.M.B.-M. as "Zach," and to her minor child T.A.S. as "Tina," none of whom are parties to this case, for the same reasons.

[3] In addition, the trial court terminated the parental rights of Zoey and John's father and Allison's father. In view of the fact that neither of the children's fathers is a party to this appeal, we will refrain from discussing the proceedings relating to either father in any detail in this opinion.

had hit twelve-year-old Edward in the face with a belt and "that the mother and grandmother are overwhelmed due to the stressful situation with the kids." Although both Edward and Allison confirmed that she had engaged in violent conduct toward Edward, the maternal grandmother reacted to the initiation of the DHHS investigation in a hostile manner and denied having hit Edward. While speaking with a social worker, the maternal grandmother disclaimed any knowledge of respondent-mother's current location or how to contact her given that respondent-mother "moves from motel to motel and calls her from a bunch of different numbers."

¶ 3    In addition, DHHS alleged that, on 9 August 2016, the maternal grandmother had reported that respondent-mother had retrieved her children from the grandmother's home. After denying that she knew where respondent-mother was or how to contact her, the maternal grandmother stated that she was no longer willing to care for the children. Following an unsuccessful attempt to contact respondent-mother by mail, a social worker used Student Locator to determine that Edward had been enrolled in school in the maternal grandmother's school district, while Zach and Alison had been enrolled in school in Haw River. At that point, the maternal grandmother told the social worker that "some of the children were in Haw River with her son and others were with their mother."

¶ 4    DHHS further alleged that the social worker had learned that the children's maternal aunt was caring for Zach, Allison, John, and Tina in her own home. As had

been the case with the maternal grandmother, the aunt claimed not to know where respondent-mother was located or how to reach her given that respondent-mother "always calls from private numbers." The aunt told the social worker that respondent-mother "will get upset with her at times and will take the children but she is unable to care for them so she will eventually have to return them to her."

DHHS alleged that the social worker had made contact with respondent-mother on 19 October 2016. Respondent-mother "reported being unstable and bouncing from motel to motel" and explained that she had left the children with members of her family for that reason. In December 2016, the social worker spoke to Zoey and John's father, who was incarcerated and had a scheduled release date of July 2017. The father reported that John was staying with his maternal aunt and uncle, that Zoey had been residing with her maternal grandmother, and that he was willing to transfer custody of his children to their current caretakers in order to prevent them from being taken into DHHS custody.

Finally, the petition alleged that DHHS had held a team decision-making meeting with the parents and caretakers on 26 January 2017, during which respondent-mother had "admitted she [was] not in a position to care [for] the children at this time." As a result, DHHS and the parents agreed that Edward would be placed with his father; that Zach, Allison, and Tina would be placed with their maternal

aunt and uncle; and that no suitable placement option could be identified for Zoey and John.

¶ 7      On 21 March 2017, DHHS filed a petition alleging that Allison was a neglected and dependent juvenile and obtained the entry of an order taking her into nonsecure custody.  In its petition, DHHS alleged that Allison's father had agreed to leave his daughter in the care of her maternal aunt and uncle while he developed a relationship with her.  Although he had failed to attend a scheduled visitation on 4 February 2017, Allison had a weekend-long visit with her father on 10 February 2017, after which Allison "expressed that she did not like being at her father's home but would not elaborate."  In addition, DHHS alleged that Allison's father had failed to attend an appointment at DHHS on 17 February 2017, at which he was scheduled to sign an agreement allowing the maternal aunt and uncle to take Allison into their custody. DHHS did not hear anything further from Allison's father until 27 February 2017, when he told the social worker that he had moved to Georgia and had no plans to return to North Carolina.  Although he claimed that his preference was for Allison to come and live with him in Georgia, the father agreed to transfer custody to Allison's maternal aunt and uncle in the event that the necessary documents were mailed to him.  However, even though she had mailed the relevant custody-related documents to the father in accordance with his request, the social worker had been unable to reach Allison's father by the date upon which the petition was filed.

¶ 8        On 20 February 2017, respondent-mother entered into a case plan agreement with DHHS. According to an updated case plan that she had entered into on 6 July 2017, respondent-mother agreed to complete a substance abuse and mental health assessment and comply with any resulting treatment recommendations; submit to random drug screens within forty-eight hours after a request for testing had been made; obtain and maintain housing that was suitable for herself and the children; verify that she had obtained sufficient income to meet her family's needs; successfully complete the Parent Assessment Training and Education Program; submit to a parenting and psychological evaluation and comply with any resulting treatment recommendations; attend scheduled visitations with the children; participate in shared parenting; refrain from making social media posts about the proceedings; and cooperate with Child Support Enforcement.

¶ 9        After a hearing held on 2 August 2017, Judge Betty J. Brown entered an order on 29 August 2017 in which she found Zoey, John, and Allison to be neglected and dependent juveniles. Judge Brown ordered that the children remain in DHHS custody, ordered respondent-mother to comply with the terms and conditions of her case plan, and authorized weekly supervised visits between respondent-mother and each of the children.

¶ 10       After the initial permanency planning hearing held on 27 October 2017, Judge Brown entered an order on 22 November 2017 establishing a primary permanent plan

of reunification for all three children, with a secondary concurrent plan of guardianship for Allison and a secondary concurrent plan of adoption for Zoey and John. In light of respondent-mother's failure to make progress toward achieving stability and her failure to comply with her mental health and substance abuse treatment recommendations, Judge Lora C. Cubbage entered an order on 15 August 2018 changing the children's primary permanent plan to one of adoption, with a secondary concurrent plan of reunification.

On 9 October 2018, DHHS filed a petition seeking to have the parents' parental rights in Zoey, John, and Allison terminated. Prior to the conclusion of a termination hearing held on 20 August 2019, Judge Angela Foster entered an order declaring a mistrial, appointing new counsel to represent Zoey and John's father, and recusing herself from the proceeding.

After a hearing held on 25 February 2020, the trial court entered an amended order on 13 May 2020 in which it determined that the parental rights of respondent-mother and both fathers were subject to termination on the basis of neglect, N.C.G.S. § 7B-1111(a)(1), and willful failure to make reasonable progress toward correcting the conditions that had resulted in the children's removal to a placement outside the family home, N.C.G.S. § 7B-1111(a)(2).[4] *See* N.C.G.S. § 7B-1111(a)(1)–(2) (2019).

---

[4] The trial court also concluded that the parental rights of Zoey and John's father were subject to termination based upon his willful failure to pay a reasonable portion of the children's cost of care pursuant to N.C.G.S. § 7B-1111(a)(3) and that the parental rights of

Similarly, after considering the dispositional factors enunciated in N.C.G.S. § 7B-1110(a) and determining that the termination of each parent's parental rights would be in the children's best interests, the trial court ordered that the parental rights of each parent be terminated. Respondent-mother noted an appeal to this Court from the amended termination order.

¶ 13    Respondent-mother's appellate counsel has filed a no-merit brief on her behalf with this Court as is authorized by N.C. R. App. P. Rule 3.1(e). As part of that process, respondent-mother's appellate counsel attempted to advise respondent-mother of her right to file a *pro se* brief on her own behalf and to provide respondent-mother with the documents that she would need to make such a filing. *See* N.C. R. App. P. 3.1(e). Subsequently, however, respondent-mother's appellate counsel notified this Court that his letter to respondent-mother explaining her right to file a pro se brief and providing her with copies of the relevant documents had been "returned to [his] office with an 'unable to forward' designation." Appellate counsel for respondent-mother described his subsequent efforts to contact respondent-mother for the purpose of complying with his obligations pursuant to N.C.R. App. P. 3.1(e) as follows:

> 4.   The undersigned mailed the no-merit documents via U.S. Priority Mail to the same address . . . he has previously sent mail correspondence [to respondent-

---

Allison's father were subject to termination for willful abandonment pursuant to N.C.G.S. § 7B-1111(a)(7) (2019).

mother]. No prior correspondences were returned before 17 September 2020.

5. The undersigned has never had direct contact with [respondent-mother] despite repeated efforts. The undersigned has contacted trial counsel on multiple occasions and requested additional contact information for [respondent-mother]. Trial counsel does not possess any viable telephone numbers, addresses, or other means of contact for [respondent-mother] beyond those already utilized by the undersigned.

6. Since the no-merit package was returned, the undersigned has attempted to locate [respondent-mother], or any viable contact information, through various means such as social media, including Facebook, as well as running searches with the BeenVerified program to no avail.

7. The undersigned has attempted to locate [respondent-mother's] relatives to obtain contact information but remains unable to locate or contact [respondent-mother] as of this filing.

8. The address utilized for mailing the no-merit documents on 8 September 2020 was the same address [respondent-mother] indicated as being her residence during her testimony on 25 February 2020.

9. The undersigned will continue to try and contact [respondent-mother] and remains willing to follow any further directives deemed necessary by this Court.

As of the present date, it appears that the subsequent efforts that respondent-mother's appellate counsel made for the purpose of attempting to contact her have proven equally unsuccessful. Respondent-mother has not submitted any written arguments to this Court for our consideration.

¶ 14    N.C.R. App. P. 3.1(e) provides that:

> Counsel *must* provide the appellant with a copy of the no-merit brief, the transcript, the printed record on appeal, and any supplements or exhibits that have been filed with the appellate court. Counsel *must* inform the appellant in writing that the appellant may file a pro se brief and that the pro se brief is due within thirty days after the date of the filing of the no-merit brief. Counsel must attach evidence of this communication to the no-merit brief.

N.C. R. App. P. 3.1(e) (emphases added). In this case, however, respondent-mother's "failure to communicate [her] current address to appellant counsel frustrates counsel's compliance with the Rule." *In re D.A.*, 262 N.C. App. 71, 74 (2018). Although we have recognized "the significant interest of ensuring that orders depriving parents of their fundamental right to parenthood are given meaningful appellate review," *In re L.E.M.*, 372 N.C. 396, 402, 831 S.E.2d 341, 345 (2019), in light of the "exhaustive efforts" that respondent-mother's appellate counsel has made to contact his client and to provide her with the notice and materials contemplated by N.C.R. App. P. 3.1(e), we elect to suspend the requirements of N.C.R. App. P. 3.1(e) as authorized by N.C.R. App. P. 2 in order "to 'expedite a decision in the public interest,'" *In re D.A.*, 262 N.C. App. at 75–76, 820 S.E.2d at 875 (quoting N.C. R. App. P. 2).

¶ 15    When a parent's appellate counsel files a no-merit brief on his or her client's behalf pursuant to N.C. R. App. P. 3.1(e), this Court reviews the issues that are identified in that brief to see if they have potential merit. *In re L.E.M.*, 372 N.C. at

402, 831 S.E.2d at 345. In the no-merit brief that he filed on his client's behalf, respondent-mother's appellate counsel identified certain issues relating to the adjudicatory and dispositional portions of this proceeding that could arguably support an award of appellate relief, including whether the trial court properly found that respondent-mother's parental rights in the children were subject to termination and whether the trial court abused its discretion by determining that the termination of respondent-mother's parental rights in the children would be in their best interests, before explaining why he believed that these potential issues lacked merit. After a careful review of the issues identified in the no-merit brief that respondent-mother's appellate counsel has filed on his client's behalf in light of the record and the applicable law, we are satisfied that the findings of fact contained in the trial court's termination order have ample record support and that those findings of fact support the trial court's determination that respondent-mother's parental rights in Zoey, John, and Allison were subject to termination on the basis of at least one of the grounds delineated in N.C.G.S. § 7B-1111(a) and that the termination of respondent-mother's parental rights in the children would be in their best interests. As a result, we affirm the trial court's termination order.

AFFIRMED.